## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **FREDERICK SMITH-MORTON,** | |
| **Plaintiff,** | |
| vs. | **CASE NO.:** |
| **TOWN OF GREENWICH, GREENWICH BOARD OF EDUCATION, THOMAS J. BOBKOWSKI, and REGINA WILLIAMS** | |
| **Defendants.** | |

## COMPLAINT & DEMAND FOR JURY TRIAL

COMES NOW Plaintiff Frederick Smith-Morton (**"Smith-Morton," "Plaintiff,"** or **"plaintiff"**), by and through his undersigned counsel, Daugherty Law Group, LLC, located at 260 Madison Avenue, Suite 8032, New York, New York, 10016, and as and for his complaint against defendants Town of Greenwich (**"Town"**), Greenwich Board of Education (**"Board"**, and collectively with **Town**, the (**"District Defendants"**), Thomas J. Bobkowski (**"Bobkowski"**) arising from his duties and employment with District Defendants, and Regina Williams (**"Williams"**) arising from her duties and employment with District Defendants, individually in his capacity as an employee of District Defendants states and alleges as follows:

## I.   **INTRODUCTION**

1.     This is an action by Plaintiff against his employers and supervisors for (1) race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e <u>et. seq.,</u> and (2) race discrimination and retaliation in violation of 42 U.S.C. §§ 1981, 1983 and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States of America.

## II.   **JURISDICTION**

2.     Jurisdiction is based on the existence of a federal question pursuant to 28 U.S.C. § 1332.

## III.   **VENUE**

3.     Pursuant to 28 U.S.C. §1391(b)(1) and (2), venue is proper within this District because Defendants, Town of Greenwich and Greenwich Board of Education, reside in Greenwich, Connecticut, Defendants Thomas J. Bobkowski and Regina Williams reside and work in Connecticut, and the conduct underlying Plaintiff's claims occurred in Connecticut.

## IV.   **EXHAUSTION OF REMEDIES**

4.     Plaintiff timely filed his complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on or about November 1, 2018 against Defendants Town of Greenwich and Greenwich Board of Education. Plaintiff received a Notice of Right to Sue ("NORTS") from the EEOC on December 2, 2020. He has filed these claims within 90 days of his receipt of the NORTS.

## V.  **PARTIES**

5.     The Plaintiff is an individual who resides at 29 Elm Tree Place, Stamford, Connecticut, 06905. Smith-Morton is currently a ("Security Guard" or "Security Officer") and has been employed by District Defendants since 2001.

6.     At all relevant times, Smith-Morton is an "employee" as defined by Title VII.

7.     Smith-Morton is African-American of race and his color is Black.

8.     The Defendant, Town of Greenwich ("Town") is a local municipality responsible for the education of its citizens. Its principal place of business located at 101 Field Point Road, Greenwich, Connecticut 06830. At all relevant times, Defendant Town employed more than 50 persons.

9.     The Defendant, Greenwich Board of Education ("Board") is responsible for overseeing the administration of education services to the residents of Defendant Town. Its principal place of business located at 290 Greenwich Avenue, Greenwich, Connecticut 06830. At all relevant times, Defendant Board employed more than 50 persons.

10.     Further, Defendant Board is responsible for the employment related decisions of Defendant Town, including but not limited to, controlling the Plaintiff's work schedule and conditions of employment and any disciplinary decision-making.

11.     The Defendant, Thomas J. Bobkowski ("Bobkowski"), is currently employed by District Defendants as the Director of School Safety Services. Defendant Bobkowski is Caucasian of race and white of color.

12.     The Defendant, Regina Williams ("Williams"), is currently employed by District Defendants as the Assistant Director of Human Resources. Defendant Williams is Caucasian of race and white of color.

## VI.     **FACTS**

13.     Mr. Smith-Morton, an African-American male, began working for the District Defendants, in the security division, stationed at Greenwich High School, on November 14, 2001.

14.     At that time, Smith-Morton was under the supervision of Robert Harris. While under the supervision of Mr. Harris, Smith-Morton received excellent or good evaluations. As a matter of fact, throughout their working relationship, Harris *never* reprimanded Smith-Morton, orally or in writing.

15.     Before the 2006-07 academic school year commenced, Defendant Bobkowski became the Director of School Safety Services.

16.     Upon Defendant Bobkowski's arrival, the security department at Greenwich High School was majority black, with five (5) African-American security officers out of a total of nine (9) security officers.

17.     From the very beginning, Defendant Bobkowski cultivated an atmosphere of racial hierarchy.

18.     African-American officers were given more burdensome duties and expected to deal with the cantankerous students at Greenwich High School.

19.     In his first meeting as Director of School Safety Services, Defendant Bobkowski told the officers, unsolicited, that his best friend was a black man.

20.    In December 2006, *within four months of taking over the security division,* Defendant Bobkowski attempted to suspend Smith-Morton for "insubordination."

21.    Smith-Morton was routinely directed by Defendant Bobkowski to remove a black student from a classroom, albeit white security officers were always available. On or around December 15, 2006, Defendant Bobkowski directed Smith-Morton to remove a black student from the classroom and Smith-Morton replied, "I'm on my lunch break."

22.    Defendant Bobkowski never ordered a Caucasian security officer to stop eating their lunch in order to remove a white or black student from a classroom.

23.    In spite of the fact that Defendant Bobkowski was standing next to two white security officers, he wanted Smith-Morton to remove the black student. A couple days later, Smith-Morton was instructed by a union representative to "go see Tom and Regina downtown."

24.    At the disciplinary meeting downtown, Defendant Regina Williams informed Smith-Morton that his job was in jeopardy for failing to respond accordingly to Defendant Bobkowski's directions. Defendant Williams and Defendant Bobkowski attempted to suspend Smith-Morton for three (3) months.

25.    Fortunately, Smith-Morton's union representative defended Smith-Morton's actions and no disciplinary action was taken.

26.    In June 2008, Defendant Bobkowski directed Defendant Williams to discipline Smith-Morton for insubordination, without informing Smith-Morton.

There was no disciplinary meeting held to discuss Defendant Bobkowski's allegations,  Smith-Morton was never given an opportunity to defend himself, and Smith-Morton did not receive the disciplinary letter that was placed in his personnel file. Defendant Bobkowski started stacking Smith-Morton's personnel file with clandestine write-ups to inhibit Smith-Morton's ability of advancement within the security division, and to establish grounds for future termination or discipline.

27.    In March 2009, Defendant Bobkowski and Defendant Williams recommended that Michael Harris, an African -American security officer, enter into a "last chance agreement" with the town of Greenwich. A few months later, Mr. Harris left school early with a Caucasian security officer. Neither Mr. Harris nor the Caucasian security officer had permission to leave early. Due to the "last chance agreement," Mr. Harris was terminated, the Caucasian security officer was not.

28.    In February 2010, Defendant Bobkowski and Defendant Williams recommended that Christopher Skates, an African-American security officer, sign a "last chance agreement" with the town of Greenwich. A few months later, Mr. Skates was terminated.

29.    In 2015, Defendant Bobkowski and Defendant Williams offered Gary Farmer, an African-American security officer, termination or resignation. Mr. Farmer decided to resign in lieu of termination.

30.   In 2018, Defendant Williams and Defendant Bobkowski offered Reginald Desir, an African-American security officer, termination or resignation. Mr. Desir decided to resign in lieu of termination.

31.   Defendant Bobkowski and Defendant Williams have *never* terminated or recommended the termination of any Caucasian security officers.

32.   Defendant Bobkowski treats Smith-Morton differently and more harshly than his Caucasian counterparts. When Defendant Bobkowski calls Smith-Morton, he is generally threatening and demeaning. Defendant Bobkowski does not speak to Caucasian security officers in that manner. Caucasian security officers are given more latitude and margin of error than African-American security officers. Smith-Morton has always been and is currently assigned a disproportionate workload.

33.   In or around 2014, Smith-Morton was denied "comp time" by Defendant Bobkowski. Mr. Smith-Morton had to involve the administrators to receive the "comp time" he was denied by Defendant Bobkowski. Fortunately, the administrators were able to pressure Defendant Bobkowski into approving Smith-Morton's  "comp time." Smith-Morton does not believe any of the Caucasian security officers have had to involve the administrators to secure the "comp time" they were entitled to.

34.   In or around the 2015-2016 school year, Defendant Bobkowski told Smith-Morton not to wear his red and blue shoes anymore. Smith-Morton was the only security officer wearing red and blue shoes. In a meeting with all of the security officers present, Defendant Bobkowski stated that security officers were

prohibited from wearing red and blue shoes, albeit there was no dress code or policy addressing the security officers' shoe color.

35.     All of the security officers were aware that Smith-Morton was the only officer wearing red and blue shoes. Smith-Morton notified his union representative, and the union representative told Smith-Morton that Defendant Bobkowski did not have the authority to dictate what color shoes the security officers wore and that he could ignore Defendant Bobkowski's demands.

36.     Due to the perceived differential treatment, Smith-Morton would routinely complain to Robert Stacy, former Greenwich Schools Director of Human Resources, about how Defendant Bobkowski and Defendant Williams treated him differently than the Caucasian security officers.

37.     Smith-Morton also complained to his union representatives about Defendant Bobkowski's discriminatory treatment.

38.     Defendant Bobkowski and Defendant Williams were told numerous times by Robert Stacy and union officials that Smith-Morton felt he was being discriminated against by them.

39.     Robert Stacy told Smith-Morton that he was concerned about Defendant Williams' relationship with Defendant Bobkowski. Mr. Stacy told Smith-Morton that Defendant Williams and Defendant Bobkowski were too close and that that may be the reason Defendant Williams defends Defendant Bobkowski against Smith-Morton's complaints.

40.     Defendant Williams, as Greenwich Schools Assistant Director of Human Resources, was and is obligated to investigate Smith-Morton's

8

complaints of discrimination. Due to her perceived relationship with Defendant Bobkowski, or due to her distrust of African-Americans failed to investigate any of Smith-Morton's complaints of discrimination.

41.    In or around the 2015-2016 school year, Defendant Bobkowski started to tell Smith-Morton that he was going to change his shift schedule. Smith-Morton would always ask why and inform Defendant Bobkowski of his coaching and parenting responsibilities.

42.    Defendant Bobkowski would often say he wanted Smith-Morton to stay late and deal with the kids during dismissal.

43.    Working the late shift and staying later into the afternoon is considered a less desirable shift to most of the security officers, including Smith-Morton.

44.    In or around the 2015-2016 school year, Defendant Bobkowski told Smith-Morton that the African American female security officer whom had filed a discrimination complaint against Defendant Bobkowski, lost her lawsuit against him.

45.    In May 2017, during collective bargaining negotiations, one of the Caucasian security officers, Nathan Covello, mentioned the differential treatment Smith-Morton received from Defendant Bobkowski. Smith-Morton agreed with Mr. Covello's statements, and further explained that Defendant Bobkowski may have been a "racist" and that he had to try and deal with it if he wished to remain employed at Greenwich High School.

46.     During the summer of 2017, Defendant Bobkowski was again made aware of Smith-Morton's complaints of racial discrimination. Defendant Bobkowski was aware that Smith-Morton would routinely talk to administrators or union representatives about the treatment he was experiencing while working under the supervision of Defendant Bobkowski. For that reason, Smith-Morton developed a relationship with former Greenwich Schools Director of Human Resources, Robert Stacy, hoping Mr. Stacy would protect him from any retaliatory actions made by Defendant Bobkowski.

47.     Defendant Bobkowski was notified of Smith-Morton's complaints by union officials, Robert Stacy, former security officer Nathan Covello, and Smith-Morton himself. Smith-Morton would complain directly to Defendant Bobkowski about his perceived differential treatment.

48.     Effective with the 2017 – 2018 school year, District Defendants changed the high school's start and end times. Before the 2017 – 2018 school year, District Defendants' start time for Greenwich High School was 7:30 a.m. with an end time of 2:15 p.m.

49.     Effective with the 2017 – 2018 school year, District Defendants' start time for Greenwich High School was 8:30 a.m. with an end time of 3:15 p.m.

50.     Smith-Morton, for 12 years in a row, would come into work at 6:00 a.m. and leave at 2:30 p.m. Smith-Morton was the **first** security officer to arrive at Greenwich High School for 12 years in a row.

51.    Smith-Morton, for 7 years in a row, would clock into work at 6:00 a.m., clock out of work at 2:30 p.m., then start practice for the Greenwich High School Junior Varsity girls basketball team at 2:30 p.m.

52.    Due to Smith-Morton's schedule, he was able to coach the girls basketball team for 7 seasons in a row.

**Defendant Bobkowski used the change in school start time as pretext to alter Smith-Morton's work schedule and prevent him from coaching**

53.    In June 2017, Defendant Bobkowski held a meeting with all of the security officers stationed at Greenwich High School and announced Smith-Morton would no longer be the first security officer to arrive at Greenwich High School for the upcoming 2017-2018 school year.

54.    Defendant Bobkowski was aware of Smith-Morton's stipend for coaching the girls basketball team at Greenwich High School.

55.    Smith-Morton was the only security officer coaching a sports team at Greenwich High School.

56.    Smith-Morton told Defendant Bobkowski that a change in his schedule would impact his ability to care for his daughter after school and coach the girls basketball team at Greenwich High School, thereby preventing him from earning additional income.

57.    In July 2017, Defendant Bobkowski told the security officers at Greenwich High School that each officer needed to submit their preferred schedule to Defendant Bobkowski and that he would give the security officers with the most seniority their preferences first.

58.    Turns out, there are two or three Caucasian security officers with more seniority than Smith-Morton. It also appears that due to the change in school start times, some of the Caucasian employees wanted the first shift.

59.    A Caucasian security officer, Phillip Walklet, was given the position of lead guard in 2013. He would arrive to work at 7:00 a.m., after Smith-Morton arrived at 6:00 a.m.

60.    Mr. Walklet does not have seniority over Smith-Morton. Despite not having seniority over Smith-Morton, Defendant Bobkowski allowed Mr. Walklet to come into work before Smith-Morton. Mr. Walklet's requested the first shift and his request was granted by Defendant Bobkowski. Smith-Morton's request for first shift was denied.

61.    Defendant Bobkowski explains away Mr. Walklet's perceived preferential treatment by stating that Mr. Walklet is the "lead guard" at the school and that he needed the lead guard at the school when it opened for "security purposes."

62.    Defendant Bobkowski's argument sounds practical until one realizes that Defendant Bobkowski's "lead guard," Mr. Walklet, prior to the 2017 – 2018 school year, wasn't scheduled to arrive at the school when it opened up.

63.    If Defendant Bobkowski wanted his "lead guard" at the school when it opened up for security purposes, one would assume Mr. Walklet always worked the first shift. **But he did not**.

64.    Mr. Walklet wasn't the first guard at the school until the school changed its hours for 2017 – 2018 school year. Ostensibly, so Mr. Walklet could

continue to work one of his two part-time jobs. One as a lifeguard and the other as an office custodian.

65.    In July 2017, Smith-Morton met with Robert Stacy, Director of Human Resources, to ask Mr. Stacy if he could help him work something out with Defendant Bobkowski. Smith-Morton suggested he could work through his lunch period and clock-out 30 minutes early so he could coach the girls basketball team. Mr. Stacy told Smith-Morton that he would talk with Defendant Bobkowski about Smith-Morton's shift change.

66.    Smith-Morton is aware of Defendant Bobkowski allowing several Caucasian security officers to work through their lunch breaks so they could leave early.

67.    A Caucasian security officer, Chris Kralik, was allowed to work through his lunch during the 2017 – 2018 school year so he could leave work early. After Christmas break, in February 2018, Mr. Kralik was allowed to come into work at 7:00 a.m. even though he didn't have seniority over Smith-Morton. Defendant Bobkowski claimed he allowed Mr. Kralik to arrive early for business reasons, namely because more students began to arrive to the building earlier, so it was decided another security officer would be needed to work the first shift. That first shift was given to Mr. Kralik and not offered to Smith-Morton, although Smith-Morton has seniority over Mr. Kralik and everyone was aware of Smith-Morton's coaching obligations.

68.    Because Defendant Bobkowski changed Smith-Morton's schedule, Smith-Morton became the **fourth** security officer to arrive at Greenwich High

School each morning. Before the change, he was the **first** security officer to arrive at Greenwich High School every morning.

69.    Although Defendant Bobkowski had allowed other Caucasian security officers to work through their lunch breaks and clock-out early, Smith-Morton's request was denied.

70.    Defendant Bobkowski told Smith-Morton that he should ask a fellow security officer to swap schedules with him. After Smith-Morton swapped schedules with Nathan Covello, Defendant Bobkowski changed Mr. Covello's schedule to a later start time in an effort to frustrate Smith-Morton's arrangement with Mr. Covello.

71.    Due to the change in his work schedule, Smith-Morton was unable to coach the girls basketball team and take care of his parenting responsibilities. On account of the fact that Smith-Morton was stationed to the Gym area at the end of his shift in the afternoons, Smith-Morton would start organizing the girls basketball practice during the last 30 minutes of his security officer shift.

72.    On or around May 16, 2018, Defendant Williams, upon the recommendation of Defendant Bobkowski,  issued a disciplinary letter suspending Smith-Morton for five (5) days. The suspension was on account of Smith-Morton "double dipping." Which means Smith-Morton was fulfilling his coaching responsibilities while on the clock as a security officer.

73.    Since Smith-Morton now had to clock-out at 4:00 p.m., and the girls basketball practice had to begin at 3:30 p.m., Smith-Morton would start the girls basketball practice during his last 30 minutes on the clock as a security officer.

Smith-Morton was stationed in the gym area from 3:30 – 4:00 so he would wait for the last student to leave the gym area before he started the girls practice.

74.    Smith-Morton would usually begin the girls' practice at 3:45 p.m., so it could be said that Smith-Morton was coaching the girls' basketball practice while on the clock as a security officer from 3:45 p.m. to 4:00 p.m. *Approximately 15 minutes a day.*

75.    Smith-Morton grieved the five (5) day suspension through his union and the union was able to reduce the suspension from five (5) days to two (2) days. Smith-Morton was suspended, without pay, October 9, 2018 and October 11, 2018.

**Similarly situated Caucasian employees are allowed to "double dip"**

76.    Caucasian security officers have been and are currently allowed to fulfil various responsibilities for Greenwich Public Schools' Athletic Department and Defendant Bobkowski and Defendant Williams are aware.

77.    Brian Kennedy, a Caucasian security officer at Greenwich High School, fulfils various duties for the Greenwich Athletic Department ("GAD").

78.    Mr. Kennedy fulfils many of these responsibilities throughout the school day, while he is still on the clock as a security officer.

79.    Mr. Kennedy passes out team uniforms to coaches while on the clock as a security officer, and Defendant Bobkowski and Defendant Williams are aware.

80.    Mr. Kennedy washes and cleans team uniforms while on the clock as a security officer, and Defendant Bobkowski and Defendant Williams are aware.

81.    Mr. Kennedy recruits other security officers and staff members to work sporting events while on the clock as a security officer, and Defendant Bobkowski and Defendant Williams are aware.

82.    Mr. Kennedy communicates with teachers and coaches via email and telephone when events are cancelled or changed while on the clock as a security officer, and Defendant Bobkowski and Defendant Williams are aware.

83.    Mr. Kennedy receives radio calls on his security officer radio from the GAD secretary when they need him to report to the GAD building to fix and maintain equipment or handle other GAD issues. Mr. Kennedy receives radio calls while on the clock as a security officer and Defendant Bobkowski and Defendant Williams are aware.

84.    Mr. Kennedy fulfills various duties and responsibilities for the GAD while on the clock as a security officer on a daily basis. Mr. Kennedy, a Caucasian male, has never been suspended for double dipping although Mr. Kennedy does so on a daily basis.

85.    Caucasian security officers are allowed to clock in-early, leave early, or "double dip" to accommodate their schedules, and none of the Caucasian security officers have been suspended.

86.    Due to Defendant Bobkowski's unilateral decision to change Smith-Morton's work schedule, Smith-Morton lost his job as coach of the girls basketball team. The coach of the girls' Varsity team told Smith-Morton that his inability to arrive to practice on time impacted her decision to fire him as the Girls' Junior Varsity basketball head coach.

87.    In November 2018, after Smith-Morton filed his complaint with Connecticut's Commission on Human Rights and Opportunities and the Equal Employment Opportunity Commission, ostensibly to arouse animosity towards Smith-Morton, Defendant Bobkowski informed several of the Caucasian security officers that Smith-Morton was "throwing them under the bus."

88.    As a result of Defendant Bobkowski's comments to several Caucasian security officers, Smith-Morton has been ostracized as an enemy to his fellow security officers.

89.    When Defendant Bobkowski took control of the Security Division at Greenwich High School, Greenwich High School employed five (5) African-American security officers. Now there are only two (2) African-American security officers working at Greenwich High School. Since taking over the Security Department at Greenwich High School in 2006, Defendant Bobkowski has *never* recommended that any of the Caucasian security officers enter into a "last chance agreement" or be terminated. On the other hand, in that same amount of time, Defendant Bobkowski has recommended that four (4) African-American security officers either enter into a "last chance agreement" with the town of Greenwich or be terminated.

90.    Since the inception of his employment with Greenwich High School, Smith-Morton has always received good or excellent performance evaluations. Smith-Morton has not had any altercations with students or faculty members, and parents routinely praise Smith-Morton's professionalism and pleasant demeanor.

91.     In June 2016, just a year before Defendant Bobkowski changed Smith-Morton's work schedule, a Greenwich High School Administrator received a letter from a parent praising  an "Exemplary Security Employee named 'Freddie.'" In this lengthy letter, the student's parent states, "thank you for your security plans and for posting Freddie every morning where he can work his magic. He exemplifies all that is good in the world – he is humble, he is kind and he does his work with joy and purpose."

## VII.     CAUSES OF ACTION

### COUNT ONE AGAINST DISTRICT DEFENDANTS:
**[42 U.S.C. §200e, et. seq., Title VII Disparate Treatment]**

92.     Paragraphs 1-91 of this Complaint are re-alleged herein as Paragraphs 1- 91 of the First Count.

93.     District Defendants, through their agents, servants and/or employees, were responsible for violating Plaintiff's federal statutory rights, and thereby improperly deprived him the freedom and liberty afforded to all citizens of this Country, without any cause, justification or excuse.

94.     Plaintiff's race and color was a motivating factor in District Defendants' employment actions set forth above with respect to compensation, treatment, and other terms of employment.

95.     As a result of these unlawful actions of District Defendants, Plaintiff has suffered and will continue to suffer economic damages and severe emotional trauma.

**COUNT TWO AGAINST DISTRICT DEFENDANTS:**
**[42 U.S.C. §200e, et seq., Title VII Retaliation]**

96.   Paragraphs 1-95 of this Complaint are re-alleged herein as Paragraphs 1-95 of this Second Count.

97.   District Defendants, through their agents, servants and/or employees, were responsible for violating Plaintiff's federal statutory rights, and thereby improperly deprived him the freedom and liberty afforded to all citizens of this Country, without any cause, justification or excuse.

98.   District Defendants retaliated against the Plaintiff for opposing their unlawful race discrimination in violation of Title VII, by, among other things, subjecting Plaintiff to abusive and differential treatment, falsely accusing him of wrongful activity, and suspending him for pretextual reasons.

99.   District Defendants suspended Plaintiff because he complained to his union officials, coworkers, and school administrators about the unfair treatment he was experiencing from Defendant Bobkowski.

100.   Plaintiff complained directly to Defendant Bobkowski about the unfair treatment he was experiencing from Defendant Bobkowski.

101.   Defendant Bobkowski was aware of Plaintiff's complaints of unfair treatment.

102.   Plaintiff complained to his union officials and coworkers in May 2017 about Defendant Bobkowski's unfair treatment.

103.   Nathan Covello, a Caucasian security officer at Greenwich High School, told union officials in May 2017 about Defendant Bobkowski's unfair treatment towards Plaintiff.

104.   Plaintiff's shift was changed in June 2017 because of Plaintiff's complaints of unfair treatment.

105.   Plaintiff was suspended in October 2018 because of Plaintiff's complaints of unfair treatment.

106.   Plaintiff ultimately lost his job as the girls' Junior Varsity Head Coach because Defendant Bobkowski changed his schedule in retaliation of his complaints.

107.   As a result of District Defendants' unlawful retaliation, Plaintiff has suffered economic damages and severe emotional harm.

**COUNT THREE AGAINST DEFENDANT BOBKOWSKI**
**[42 U.S.C. §§ 1981, 1983 and 14th Amendment of United States Constitution]**

108.   Paragraphs 1-107 of this Complaint are re-alleged herein as Paragraphs 1-107 of this Third Count.

109.   At all times herein, Defendant Bobkowski, was and is the Greenwich Public Schools Director of School Safety Services and was acting under color of state law. He is Plaintiff's direct supervisor. Defendant Bobkowski is being sued in his individual capacity.

110.   Defendant Bobkowski is Caucasian of race and white of color and has served as District Defendants' Director of School Safety Services since 2006.

111.   Plaintiff's race and color was a motivating factor in Defendant Bobkowski's employment actions set forth above with respect to compensation, treatment, and other terms of employment.

112.   Acting under color of state law, Defendant Bobkowski violated Plaintiff's constitutional rights by subjecting him to unfair treatment and suspension.

113.   Defendant Bobkowski has input into personnel decisions at Greenwich High School including hiring, firing, evaluations and discipline of employees.

114.   As a result of these unlawful actions, Plaintiff has suffered economic damages and severe emotional trauma.

**COUNT FOUR AGAINST DEFENDANT BOBKOWSKI**
**[Retaliation 42 U.S.C. §§1981, 1983, 14th Amendment]**

115.   Paragraphs 1-114 of this Complaint are re-alleged herein as Paragraphs 1-114 of this Fourth Count.

116.   Defendant Bobkowski, as a public school employee acting in his official capacity as District Defendants' Director of School Safety Services was acting under the color of state law when he violated Plaintiff's constitutional rights.

117.   Defendant Bobkowski subjected Plaintiff to the treatment alleged herein because Plaintiff complained of or otherwise opposed discrimination.

118.   Defendant Bobkowski was aware of Plaintiff's complaints.

119.   As a result of these unlawful actions, Plaintiff has suffered economic damages and severe emotional trauma.

**COUNT FIVE AGAINST DEFENDANT WILLIAMS**
**[42 U.S.C. §§ 1981, 1983 and 14th Amendment of United States Constitution]**

120.   Paragraphs 1-119 of this Complaint are re-alleged herein as Paragraphs 1-119 of this Fifth Count.

121.   Defendant Regina Williams ("Williams"), is currently employed by District Defendants as the Assistant Director of Human Resources. Defendant Williams is Caucasian of race and white of color. Defendant Williams is being sued in her individual capacity. At all times herein, Defendant Williams was acting under color of state law.

122.   Plaintiff's race and color was a motivating factor in Defendant Williams' employment actions set forth above with respect to compensation, treatment, and other terms of employment.

123.   Acting under color of state law, Defendant Williams violated Plaintiff's constitutional rights by subjecting him to unfair treatment and suspension.

124.   Defendant Williams has input into personnel decisions at Greenwich High School including hiring, firing, evaluations and discipline of employees.

125.   Defendant Williams abdicated her responsibilities as Assistant Director of Human Resources by refusing to investigate Plaintiff's complaints of discrimination and by supporting any and all of Defendant Bobkowski's disciplinary recommendations.

126.   Plaintiff was forced to report to Defendant Williams' office more than any other security officer at Greenwich High School. Plaintiff was threatened with

suspension or termination at each meeting.  These meetings caused tremendous anxiety for Plaintiff.

127.   As a result of these unlawful actions, Plaintiff has suffered economic damages and severe emotional trauma.

## COUNT SIX AGAINST DEFENDANT WILLIAMS
## [Retaliation 42 U.S.C. §§1981, 1983, 14th Amendment]

128.   Paragraphs 1-127 of this Complaint are re-alleged herein as Paragraphs 1-127 of this Sixth Count.

129.   Defendant Williams, as a public school employee acting in her official capacity as District Defendants' Assistant Director of Human Resources was acting under the color of state law when she violated Plaintiff's constitutional rights.

130.   Defendant Williams subjected Plaintiff to the treatment alleged herein because Plaintiff complained of or otherwise opposed discrimination.

131.   Plaintiff complained directly to Defendant Williams on several occasions. Defendant Williams ignored Plaintiff's complaints.

132.   Plaintiff complained to Defendant Williams' immediate supervisor , Robert Stacy, on several occasions about Defendant Williams' unfair treatment.

133.   Robert Stacy told Defendant Williams about Plaintiff's complaints of unfair treatment.

134.   As a result of these unlawful actions, Plaintiff has suffered economic damages and severe emotional trauma.

## VIII.   **PRAYER FOR RELIEF**

Wherefore, the Plaintiff respectfully prays this Court take jurisdiction over this case and grant judgment against the Defendants. Plaintiff prays that the following relief be awarded:

a. Compensatory damages in an amount this Court shall consider just and fair;

b. Punitive damages in an amount this Court shall consider just and fair;

c. Attorney's fees and reimbursement of cost of the instant action;

d. Reimbursement of back wages and compensation for Plaintiff's lost income as the District Defendants' Junior Varsity Girls basketball coach;

e. Prejudgment interest; and

f. All other relief that this Court deems just and fair.

## IX.   **DEMAND FOR JURY TRIAL**

135.   Plaintiff demands a jury trial on all issues so triable against Defendants.

DATED this **18th** day of **February**, **2021**

<div style="margin-left:40%">

Respectfully submitted by,

Ryan D. Daugherty
Daugherty Law Group, LLC
260 Madison Avenue, Suite 8032
New York, New York 10016
(646) 859-1674
Federal No. ct30807
His Attorney

</div>